# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

JAMESIA SULLEN,

          Plaintiff,

v.

METROPOLITAN COUNCIL through its
operating division, METRO TRANSIT, and
JOHN DOES 1-5,

          Defendants.

Civil Action No. _____

**COMPLAINT**

Plaintiff Jamesia Sullen, by and through her attorneys, brings this action for compensatory damages and other legal and equitable relief for violations of federal and state law committed by Metropolitan Council, through its operating division Metro Transit, and John Does 1-5. Plaintiff alleges and avers as follows:

## JURISDICTION AND VENUE

1.  Plaintiffs' federal claims arise under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq*., and 42 U.S.C. §§ 1981 and 1983. As such, this Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343, and 29 U.S.C. § 2617(a)(2).  This Court has supplemental jurisdiction over Plaintiffs' state law claims, pursuant to 28 U.S.C. § 1367, as they form part of the same case or controversy as the subject of Plaintiffs' federal law claims.

2.  Venue is proper in the District of Minnesota pursuant to 28 U.S.C. § 1391, as Plaintiff resides or has resided in this District, Defendant has headquarters in and/or

can be found and conducts business in this District, and the events or omissions giving rise to Plaintiff's claims occurred in this District.

## THE PARTIES

3.    Plaintiff Jamesia Sullen resides in the State of Minnesota, and was employed by Metro Transit as a bus operator from July to September of 2021.

4.    Defendant Metropolitan Council ("Met Council") is a state agency created to provide essential services to the seven-county Minneapolis-St. Paul metropolitan area. Met Council provides public transportation services through its operating division, Metro Transit, which has more than fifty employees.  Met Council receives federal funding to help pay for the services it provides, including transportation services through Metro Transit.

5.    John Does 1-5 are persons employed by Metro Transit who, on behalf of the State of Minnesota, were responsible for administering road tests to qualify other Metro Transit employees for commercial drivers' licenses.

## FACTUAL ALLEGATIONS

6.    Plaintiff re-alleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

**A.    Plaintiff Is Discriminated Against by the Metro Transit Instruction Center.**

7.    Plaintiff is an openly lesbian, African-American woman.  In July of 2021 she interviewed for a position as a bus driver at Metro Transit.  Although her hiring date was July 12, 2021, Metro Transit agreed to delay Plaintiff's starting date for enough time to attend the funeral for her brother, who had recently passed away.

8.      Plaintiff initially was assigned for training at the Instruction Center, in the Metro Transit Operations Support Center located at 725 North 7th Street, Minneapolis, Minnesota. Her two other classmates were Comparator 1 (a white, heterosexual women) and Comparator 2 (a white, heterosexual woman). Plaintiff observed that Comparators 1 and 2 received personal, supplemental training that Plaintiff did not. Plaintiff also was denied critical training, including but not limited to "Fare Box" and "Maps and Panels" training. This training was, however, provided to Comparators 1 and 2.

9.      Plaintiff was subjected to personal attacks and other hostility at the Instruction Center. For example, soon after she started, the head of the Instruction Center told Plaintiff that he "didn't like the way she answered questions." On another occasion, Instructor 1 asked Plaintiff if she "threw her lifestyle in other people's faces;" when she responded that she did not, Instructor 1 covered his face with his hands, said "Yuck," and lamented that one of his nephews "was born as a niece." Afterwards, and for the rest of her time at the Instruction Center, Plaintiff was ostracized by Instructor 1 and other instructors. Comparators 1 and 2 did not suffer this same treatment.

10.     The hostility and disparate treatment Plaintiff suffered caused stress, and made her feel anxious about continuing to work at Metro Transit. Nonetheless, Plaintiff continued working there based upon her hope that the discrimination was limited to the Instruction Center.

**B.    Metro Transit Terminates Plaintiff Based Upon False Road Test Scores.**

11.     To be employed as a Metro Transit bus operator, a driver must have a Class B Commercial License, which requires a road test. Employees in training, like Plaintiff,

are provided with two chances to pass the Class B road test, which is administered by a Metro Transit driving instructor. If the employee does not pass the road test in two attempts, he or she is terminated from Metro Transit and must wait six months to re-apply.

12.    Plaintiff's first road test for her commercial license took place on July 30, 2021, at the Instruction Center. After about ten minutes of driving, Plaintiff and her tester, Instructor 2, approached a railroad crossing.  Plaintiff stopped and looked both ways before crossing the tracks.  After they had crossed, Instructor 2 ordered her to pull over so they could switch seats.  He then drove the bus all the way back to the Instruction Center before informing Plaintiff that she had failed the test for not stopping within fifteen feet of the railroad crossing. Plaintiff disagreed with his assertion, but there was no way to challenge it because by that time the bus was back at the station; an untold number of other vehicles had passed over the crossing and likely obscured any tire tracks or other evidence that would have shown otherwise.

13.    Rather than attempt to challenge the result, Plaintiff took the road test a second time on August 2, 2021. A different instructor, Instructor 3, administered the test, and this time, Plaintiff earned a passing score. She was informed of this fact and was given a yellow copy of her scoring sheet that showed her passing score. Plaintiff also took a photo of Instructor 3's pink copy of her scoring sheet.

14.    Plaintiff was out purchasing her Metro Transit driver's uniform when she was informed that she had failed the test, and consequently was being terminated effective immediately. When Plaintiff asked for an explanation, the head of the

Instruction Center said only that Instructor 3 committed a "math error" and refused to elaborate.

15.     Plaintiff was required to surrender her yellow copy of the test so that it could be changed to correspond to Instructor 3's "corrected" pink copy. Plaintiff surrendered her copy after she was warned that a failure to do so would threaten any chance of future employment with Metro Transit. Plaintiff did not tell anyone that she had a photo of the original pink copy.  Plaintiff also was forced to sign paperwork stating that she had failed both road tests. She was terminated from employment that same day, and was ordered to leave the premises immediately.

16.     As she was leaving the premises, another Metro Transit employee quietly informed Plaintiff that the Instruction Center had engaged in "foul play" regarding her test. On information and belief, Instructor 2 (the same instructor who earlier had failed Plaintiff) removed her score sheet from the others and falsely altered the total so that it showed a failing score. Other Metro Transit employees, including the head of the Instruction Center, participated in covering up Instructor 2's actions by approving, with their initials, the altered yellow sheet showing the false score.

## C.     After Plaintiff Complains to Her Union, Metro Transit Offers Plaintiff A Third Road Test.

17.     Plaintiff informed her union representatives about what happened with the road tests. One of her representatives called a Metro Transit Assistant Transportation Manager ("ATM 1") while Plaintiff was in the room, with the phone on speaker so Plaintiff could hear the conversation.  When the union representative told ATM 1 he was

calling about Plaintiff, ATM 1 (who was unaware Plaintiff was listening to their conversation) laughed and told the union representative he was "barking up the wrong tree" with Plaintiff, i.e., that Plaintiff was not sexually attracted to the union representative because of her sexual orientation. ATM 1 terminated the call when the representative said he would recommend that Plaintiff retain an attorney.

18.    A few days later, ATM 1 called Plaintiff to say that "the State" had "re-calculated" her score and that she had passed her road test after all. According to ATM 1, however, the Department of Public Safety ("DPS") would not allow Plaintiff's score to be changed from a "fail" to a "pass," so a third road test was still necessary. ATM 1 said he might be able to persuade DPS to relax the six-month-wait requirement for a third test if Plaintiff signed a statement attesting to Metro Transit's version of what happened in scoring her previous test.

19.    Plaintiff was instructed to go to the Instruction Center, where the head of the Instruction Center presented her with a statement to sign. Plaintiff protested that the statement had her attest to actions by Metro Transit that were incorrect or that she knew nothing about. The head of the Instruction Center told Plaintiff that the statement could not be altered, that he was just a "puppet" or words to that effect, and that Plaintiff's only choice was sign the statement or wait six months to take another road test. Thus compelled, Plaintiff signed the statement. Then, the head of the Instruction Center ordered Plaintiff to destroy her copy of her earlier forced statement that she had failed both tests, along with the rest of her week-old termination paperwork. He stood by and watched to make sure Plaintiff did it.

20.    Plaintiff took the road test for third time on August 10. This time, the test was administered at a state facility by a DPS employee.  Plaintiff passed the test without incident.

21.    During the road test, Plaintiff related to the DPS employee Metro Transit's explanation for why Plaintiff was being allowed to re-take the test for a third time without the mandatory six-month wait. The employee told Plaintiff that the state only received an applicant's overall road test score, and thus had no ability to "recalculate" it.

22.    Upon information and belief, the reason Plaintiff was allowed to take the test a third time was because Metro Transit knew Plaintiff's score was doctored and was concerned about litigation.  Furthermore, upon information and belief, the ATM, head of the Training Center, and other Metro Transit employees lied to Plaintiff about the state supposedly "recalculating" her score.  Plaintiff further alleges that Metro Transit covered up these and other misdeeds by, inter alia, demanding that Plaintiff sign the false statement and destroy documents, upon threat of termination with no chance of being re-hired.

**D.  Plaintiff Complains About Discrimination At Metro Transit.**

23.    On or about August 11, 2021, Plaintiff contacted the Met Council's Office of Equal Opportunity ("OEO") to submit a formal complaint of discrimination based upon her race, gender, and/or sexual orientation. Among other things, Plaintiff explained how Metro Transit had changed her August 2, 2021 road test score so that it showed a "fail," and provided the OEO investigator with photos of the original and doctored copies of her road test score.

24.    Plaintiff subsequently provided additional information to the OEO investigator about ongoing harassment at Metro Transit, answered the investigator's questions, and otherwise cooperated fully with the investigation.

25.    Although Metro Transit promised to investigate her complaint, Plaintiff never received a notice, letter, or other indication that the investigation had been concluded or what the results of the investigation were.

**E.  Metro Transit Retaliates Against Plaintiff.**

26.    On August 20, 2021, only a short time after her return to Metro Transit, Plaintiff  was ordered to submit to "random" drug testing. Plaintiff submitted to the drug test and passed it.

27.    On information and belief, Plaintiff was not selected at "random," but in retaliation for her discrimination complaint against Metro Transit. Plaintiff reported the drug testing incident to the OEO investigator, but to Plaintiff's knowledge nothing was ever done about it.

28.    On August 21, 2021, in his first encounter with Plaintiff since he doctored her road test result, Instructor 2 expressed surprise at seeing Plaintiff back at Metro Transit, saying words to the effect of: "Wow, Jamesia, what are you doing here? They let you come back?" He offered no apology or explanation for falsifying her road test score. Not did he indicate he had been contacted by the OEO investigator, or disciplined for his misconduct. Instead, Instructor 2 continued to question Plaintiff's right to work at Metro Transit.

29.     Plaintiff found her encounter with Instructor 2 so unsettling, she  informed the OEO investigator about it. On information and belief, nothing was done to investigate, confirm, or correct this and the other ongoing harassment suffered by Plaintiff.

30.     From August 28 to September 6, while she waited to be assigned to a garage, Plaintiff operated a bus for Metro Transit at the Minnesota State Fair.  During this time Plaintiff got to know some of the other drivers at various Metro Transit garages, several of whom told her that managers "know all about you before you ever set foot in [their] garage," or words to that effect, because Instruction Center employees give their views about New Hires to the garage managers. Given her tumultuous experience with the Instruction Center, Plaintiff  feared that wherever she was assigned, she would be undermined before she even arrived.

31.     On or about September 7, 2021, Ms. Sullen was told to report to the Martin J. Ruter facility ("Ruter") at 6845 Shingle Creek Parkway, Brooklyn Center, Minnesota as a "New Hire" for additional training.  Other Ruter "New Hires" included Comparator 3 (a heterosexual woman of color), Comparator 4 (a man of color), Comparator 5 (a heterosexual woman of color), and Comparator 6 (a man of color).

32.     An Assistant Transportation Manager ("ATM 2") was assigned to provide the New Hires with further training. Since Plaintiff still did not have the requisite "Fare Box" and "Maps and Panels" training, ATM 2 had to train her on those subjects when not busy with the other training.

33.     The disparate treatment Plaintiff experienced at the Instruction Center continued at Ruter. For example, the Assistant Manager to whom Plaintiff directly reported ("ATM 3") showed annoyance toward Plaintiff and mocked her for asking questions (e.g. "of course *you* would have a question Jamesia"). As another example, Plaintiff was not provided a functioning work badge that enabled her to unlock and enter the building, although Comparators 3-6 all were given functioning work badges.  When Plaintiff asked for a functioning work badge, she was told that she did not need one. As a result, Plaintiff had to wait for somebody to let her in so she could clock in each day.

34.     On Friday, September 10, 2021, after about a week of training, ATM 2 announced that all of the Ruter New Hires were to be "turned in" to Ruter that day – except for Plaintiff, whose assignment to Ruter was mysteriously delayed until the following Monday, September 13, 2021.  When Plaintiff asked why her assignment to Ruter was delayed, ATM 2 refused to say other than to assure Plaintiff that "it's all good." Stressed and anxious that once again she was being singled out, gaslighted, and set up for termination, Plaintiff took the next two days off to consider whether to continue her employment with Metro Transit.

35.     Unbeknownst to Plaintiff, the previous day, Ruter's Acting Garage Manager (the "GM") asked ATM 2 to give her a "list of items" to be addressed regarding Plaintiff's "behavior," for a meeting with Plaintiff that was scheduled for – coincidentally or not –  September 13, 2024, the same day that Plaintiff was to be "turned in" to the Ruter Garage.  ATM 2 responded with a list of criticisms of Plaintiff such as "voice is to [sic] loud and overbearing," that Plaintiff should "keep discussions positive," and that she

10

had a "bad attitude." Plaintiff was not informed of these allegations against her or the need for a meeting.

36.    When she retuned to work on Monday, September 13, 2024, Plaintiff was called into a meeting with the GM and ATM 3, supposedly for "additional training." But after the training was completed, the GM told Plaintiff that while she was there, she needed to sign for an "Occurrence" because she had missed the previous two days of work. As Plaintiff was about to sign, GM added that she was "concerned" that the Occurrence would "hold [Plaintiff] up" after she was assigned to Ruter. Plaintiff replied that the Occurrence would not have any effect, since the contract between the ATU and Metro Transit provided that existing Occurrences were to "fall off" once a driver is assigned to a new garage.  Since Plaintiff still had not been formally assigned to Ruter, the Occurrence would be automatically disappear once she was formally assigned to Ruter – which ATM 2 said was to happen that very day.

37.    Both the GM and ATM 3 vehemently disputed Plaintiff's reading of the ATU contract, and the GM threatened to cite Plaintiff with another "Occurrence" for supposedly "taking the day off" to attend her brother's funeral two months earlier, before Plaintiff even started working at Metro Transit. Two Occurrences would mean that Plaintiff's employment could be terminated at any time, for any reason. Therefore, Plaintiff signed for the one Occurrence, but added a statement reiterating her understanding that all Occurrences fall off once an employee is turned in to a garage, and that since she had not yet been turned into Ruter, the Occurrence would not be part of her record there.

38.     The GM later admitted to Plaintiff – in front of the other drivers -- that her interpretation of the ATU contract was correct, and that her Occurrence would fall off her record as Plaintiff had contended.  Plaintiff, who kept her employment issues private and expected Metro Transit to do the same, was embarrassed by the disclosure of her disciplinary issues to the rest of the garage.

39.     On Thursday, September 16, 2021, Plaintiff (who still had not been formally "turned in" to Ruter), ATM 2, and Comparators 3-6 gathered to board a parked training bus. The bus engine was turned off. As she entered the bus, Plaintiff turned off her cellphone, walked about ten feet over to her lunchbox, stowed the cellphone inside, and took her seat. Nobody said anything to her about her phone, including ATM 2, who was standing about two feet away. The group then commenced their training exercises without incident.

40.     Later that same day, Plaintiff was confronted by ATM 3, who said Plaintiff had been reported for violating the company's cellphone policy. Because she recalled turning her cellphone off when she entered the bus, and because it was still powered off hours later when she retrieved it, Plaintiff denied the accusation.  Thinking there had been some sort of mistake, Plaintiff asked for the source of the accusation, but ATM 3 refused to say. Instead, ATM 3 suspended Plaintiff pending an "investigation."

41.     The next day, Friday, September 17, 2021, Plaintiff was called in for a meeting with ATM 3, another manager, and Plaintiff's union representative.  Although Plaintiff was told the meeting was about an alleged cellphone violation, the two Metro Transit managers asked numerous unrelated questions such as "have you made negative

comments about white men?" and "are you opinionated and share those opinions with others?" The relevance of these questions to the cellphone accusation was not explained.

42.   Plaintiff was informed that video evidence showed the phone was still powered on when Plaintiff boarded the bus.  Plaintiff's request to view the video was denied.  Plaintiff explained that her phone was relatively old and took about 45 seconds to power down, which Plaintiff then demonstrated to everyone present. Plaintiff was informed that even so, she was being terminated because her phone had not shut down *completely* before she boarded the parked bus.

43.   By suspending and then terminating Plaintiff, Metro Transit selectively enforced its cellphone policy against Plaintiff in a discriminatory manner and in retaliation for Plaintiff's prior discrimination complaint. Plaintiff witnessed ATM 2 and Comparators 3-6 routinely using their cellphones while riding the training bus. Indeed, ATM 2 was often seen playing games on his phone while the bus was in operation.  Yet, on information and belief, none of these other employees suffered any discipline for violating the same cellphone policy that Metro Transit used to terminate Plaintiff without warning.

44.   A few days after she was terminated, Plaintiff filed another internal complaint with Met Council's OEO.  She received no response.  On information and belief, Plaintiff's complaint about her wrongful termination was not investigated.

45.   Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on January 28, 2022.  A Right to Sue Letter was issued on March 18, 2024.  See Exhibit A attached hereto.

## COUNT I
## INTENTIONAL DISCRIMINATION
## IN VIOLATION OF TITLE VII
## 42 U.S.C. §§ 2000e, et. seq.

46.      Plaintiff re-alleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

47.      By conduct committed by Metro Transit, Met Council violated Title VII of the Civil Rights Act of 1964, as amended, in that it purposefully discriminated against Plaintiff on the basis of her race, sex, and/or gender.

48.      Race, sex, and/or gender were one or more motivating factors in Metro Transit's mistreatment of Plaintiff.

49.      Metro Transit acted willfully or in reckless disregard of Plaintiff's federally-protected rights.

50.      As a direct, proximate and foreseeable result of Defendant's discriminatory actions, Plaintiff has suffered and continues to suffer loss of income and employment benefits, mental anguish, emotional distress, humiliation, and other injury.

51.      Plaintiff is entitled to compensatory damages, costs, expenses, and attorneys' fees, in an amount to be determined at trial.

## COUNT II
## HARASSMENT/HOSTILE WORK ENVIRONMENT
## IN VIOLATION OF TITLE VII
## (42 U.S.C. Sec. 2000e-2(a))

52.      Plaintiff re-alleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

53.      Pursuant to 42 U.S.C. Sec. 2000e-2(a), a public or private employer may

not subject an employee to a hostile work environment that affects the terms, conditions, or privileges of employment.

54.    The employment practices and policies of Met Council's operating division Metro Transit were so severe and/or pervasive that they altered the conditions of Plaintiff's employment and created an abusive working environment for Plaintiff.

55.    Specifically, Plaintiff was subjected to derogatory comments, unfounded accusations, doctored records, and other harassment by her managers. Plaintiff complained about this conduct, yet it continued for several more weeks up to and including Plaintiff's termination.

56.    Race, sex, and/or gender were one or more motivating factors in Metro Transit's mistreatment of Plaintiff.

57.    Metro Transit acted willfully or in reckless disregard of Plaintiff's federally-protected rights.

58.    As a direct, proximate and foreseeable result of Metro Transit's abuse, Plaintiff has been damaged.

59.    Plaintiff is entitled to equitable relief, back pay, compensatory damages, costs, expenses, and attorneys' fees, in an amount to be determined at trial.

## COUNT III
## INTENTIONAL DISCRIMINATION
## IN VIOLATION OF SECTION 1981
## 42 U.S.C. § 1981 et. seq.

60.    Plaintiff re-alleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

61.     Plaintiff is protected by 42 U.S.C. § 1981 ("Section 1981"), which prohibits discrimination on the basis of race in, *inter alia,* the making or enforcement of contracts. As a union member, Plaintiff had a contractual interest in the ATU-Metro Transit Contract. As an employee, Plaintiff had a contractual interest in Metro Transit's employee policies, practices and procedures.

62.     On information and belief, race was a motivating factor in Metro Transit's intentionally erroneous, selective, and fraudulent enforcement of disciplinary provisions of the ATU-Metro Transit contract and Metro Transit employee's policies and practices, as alleged herein.

63.     As a result of the discriminatory actions of Met Council's operating division Metro Transit, Plaintiff has suffered actual and consequential injury, and is entitled to compensatory damages, attorneys' fees and costs in an amount to be determined at trial.

**COUNT IV**
**DISCRIMINATION**
**IN VIOLATION OF SECTION 1983**
**42 U.S.C. § 1983 et. seq.**

64.     Plaintiff re-alleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

65.     Plaintiff is protected by 42 U.S.C. § 1983 ("Section 1981"), which prohibits race discrimination by government actors and entities acting "under color of state law."

66.     As an administer of road tests, which are required for commercial drivers' licenses, Metro Transit performs a traditional state function on behalf of the State of

Minnesota.  As such, in administering Plaintiff's road tests, John Does 1-5 were acting under color of state law.

67.    John Does 1-5 and Metro Transit discriminated against Plaintiff by, inter alia, falsely failing her first road test and falsifying her score on her second test.  They further discriminated against Plaintiff by requiring her to sign false statements about the road tests and destroy relevant documents, none of which were bona fide occupational qualifications, but which Defendants required under color of state law for Plaintiff to obtain her commercial drivers' license.

68.    On information and belief, Defendants' intentionally obstructive and fraudulent actions with respect to Plaintiff's procurement of a commercial driver's license, as alleged herein, were motivated by her race, sex, and/or gender.

69.    As a result of the discriminatory actions committed by John Does 1-5 while working for Met Council's operating division Metro Transit, Plaintiff suffered actual and consequential injury, and is entitled to compensatory damages, attorneys' fees and costs in an amount to be determined at trial.

**COUNT V**
**RETALIATION**
**IN VIOLATION OF TITLE VII**
**42 U.S.C. §§ 2000e-3(a)**

70.    Plaintiff re-alleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

71.    Title VII expressly proscribes retaliation against anyone who has opposed any practice made an unlawful employment practice by Title VII or who has made a

charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the Title VII statutory scheme.

72.    Plaintiff's complaints to the OEO about discrimination at Metro Transit were protected activity.

73.    At all material times, Met Council was aware of the complaints made by Plaintiff.

74.    After being made aware of the complaints made by Plaintiff regarding workplace discrimination, Met Council's operating division Metro Transit took adverse employment actions against her. These adverse employment actions included, but were not limited to:  selecting Plaintiff for "random" drug testing, delaying Plaintiff's "turn in" to Ruter, subjecting her to ridicule and otherwise harassing her in front of her peers and, ultimately, terminating her based upon a trumped-up cellphone violation.

75.    The adverse employment actions were motivated by, and in retaliation for, the complaints made by Plaintiff about workplace discrimination.

76.    As a direct, proximate and foreseeable result of Metro Transit's retaliation, Plaintiff has been and continues to be injured.  Plaintiff is entitled to compensatory damages, attorneys' fees and costs in an amount to be determined at trial.

**<u>COUNT VI</u>**
**RETALIATION**
**IN VIOLATION OF SECTIONS 1981 AND 1983**
**42 U.S.C. § 1981 et. seq.**

77.    Plaintiff re-alleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

78.     Pursuant to 42 U.S.C. § 1981, it is illegal for a public or private employer to retaliate against a person for complaining about activity protected by Section 1981. In the case of a state actor, a violation of § 1981 is actionable pursuant to 42 U.S.C. § 1983 if the person acted under color of state law in discriminating against the plaintiff.

79.     Plaintiff's complaints to the OEO about discrimination at Metro Transit were protected activity.

80.     At all material times, Metro Transit was aware of the complaints made by Plaintiff.

81.     After being made aware of the complaints made by Plaintiff regarding workplace discrimination, Met Council's operating division Metro Transit took adverse employment actions against her. These adverse employment actions included, but were not limited to:  selecting Plaintiff for "random" drug testing, delaying Plaintiff's "turn in" to Ruter, subjecting her to ridicule and otherwise harassing her in front of her peers and, ultimately, terminating her based upon a trumped-up cellphone violation.

82.     The adverse employment actions were motivated by, and in retaliation for, the complaints made by Plaintiff about workplace discrimination, including her road tests.

83.     As a direct, proximate and foreseeable result of Metro Transit's retaliation, Plaintiff has been and continues to be injured.  Plaintiff is entitled to compensatory damages, attorneys' fees and costs in an amount to be determined at trial.

## COUNT VII
## UNFAIR EMPLOYMENT PRACTICES
## IN VIOLATION OF <u>MINN</u>. <u>STAT</u>. § 363A.08

58.    Plaintiff re-alleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

59.    At all times material hereto, Plaintiff was an "employee" and Defendant was her "employer" within the meaning of <u>Minn</u>. <u>Stat</u>. §§ 363A.03, 363A.08.

60.    <u>Minn</u>. <u>Stat</u>. § 363A.08 prohibits an employer from engaging in employment practices that discriminate against applicants and employees on the bases of, inter alia, race, color, sex, marital status, familial status, or sexual orientation.

61.    By Metro Transit's conduct, Met Council violated <u>Minn</u>. <u>Stat</u>. § 363A.08.

62.    As a direct, proximate and foreseeable result of Defendant's conduct, Plaintiff has suffered and continues to suffer loss of income and employment benefits, mental anguish, emotional distress, humiliation, and other injury.

63.    Plaintiff is entitled to compensatory damages, costs, expenses, and attorneys' fees, in an amount to be determined at trial.

## COUNT VIII
## REPRISAL IN VIOLATION OF
## <u>MINN</u>. <u>STAT</u>. § 363A.15 and § 181.943

64.    Plaintiff re-alleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

65.    <u>Minn</u>. <u>Stat</u>. § 363A.15(1) provides that it is an unfair discriminatory practice for any employer, or any employee or agent thereof, to engage in any reprisal against any person because that person engaged in an activity or right protected by the

Minnesota Human Rights Act.

66.     A reprisal forbidden by this section includes, but is not limited to, "any form of intimidation, retaliation, or harassment."

67.     By Metro Transit's conduct, Met Council violated Minn. Stat. § 363A.15(1).

70.     As a direct, proximate and foreseeable result of Defendant's conduct, Plaintiff has suffered and continues to suffer loss of income and employment benefits, mental anguish, emotional distress, humiliation, and other injury.

71.     Plaintiff is entitled to compensatory damages and injunctive relief, along with costs, expenses, and attorneys' fees, in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Jamesia Sullen prays for judgment against Defendant Metro Transit as follows:

1.  A Declaration that the practices complained of herein were unlawful and violated the federal and state statutes cited above;

2.  Compensatory damages to Plaintiff, including but not limited to lost wages and benefits, back pay, front pay, mental anguish, emotional distress, pre and post-judgment interest, attorneys fees, and costs, in an amount to be determined at trial;

3.  Liquidated damages, as authorized by 29 U.S.C. § 2617; and

4.  Such further relief as the Court deems necessary and proper.

## JURY DEMAND

Plaintiff demands a jury for all issues so triable.

Dated: June 6, 2024                By  __/s/ Kent M. Williams_____
                                   Kent M. Williams (Minn. Atty No. #222884)
                                   WILLIAMS LAW FIRM
                                   1632 Homestead Trail
                                   Long Lake, MN 55356
                                   612-940-4452
                                   kent@williamslawfirmmn.com
                                   williamslawmn@gmail.com

                                   ATTORNEYS FOR PLAINTIFF